**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY A. MARTING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 00 C 7132 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| CRAWFORD & CO., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kimberly Marting worked as a claims adjuster for defendant Crawford & Company for ten years until she left in May 2000. She was then making about $70,000 a year, which included a bonus of around $20,000. Later that year, in October 2000, she filed a lawsuit in this District, alleging that she left the company only because she was sexually harassed and then retaliated against for complaining about that harassment. In that lawsuit, she also alleged that she was paid significantly less than male claims adjusters at Crawford who were less qualified and experienced than she was. That lawsuit was assigned to a different Judge and later terminated in Crawford's favor on summary judgment.

A month after filing that lawsuit, plaintiff filed this lawsuit, a collective action complaint under the Fair Labor Standards Act, alleging that she and the other Crawford claims adjusters were not paid overtime. Earlier in the lawsuit, Crawford filed a motion to dismiss in which it argued that, as a matter of law, casualty claims adjusters are exempt under the FLSA. Finding

that this is a fact intensive inquiry, we denied the motion.  Plaintiff later filed a motion for initial

notice to the proposed opt-in class.  After briefing, we denied that motion because plaintiff had

not provided sufficient evidence to justify sending notice to what would be a large number of

employees working at 400 branch offices.  Discovery ensued and the parties have now filed

cross-motions for summary judgment.  Because these two motions were briefed on separate

tracks and the parties were also allowed to file oversized briefs, both sides have had ample

opportunity to present their arguments.

    In its briefs, Crawford argues generally that plaintiff's job as a claims adjuster involved

discretionary and important duties – determining initial coverage, making liability

determinations or recommendations, and trying to negotiate and settle claims within defined

limits – that are of the type that most courts have held fall with the FLSA's administrative

exemption.

    In her briefs, plaintiff argues that her job title was a misnomer and that she had little

discretion because she had to follow strict rules and regulations of both Crawford and its clients

and because her work was closely reviewed by her supervisors.  She claims that she was like a

"foot soldier" in Crawford's "army" or alternatively like an assembly line worker who follows

strict rules and has no authority to deviate from the script.

    We are thus presented with two sharply contrasting portrayals.  Simply stated, the issue

boils down to whose version is correct under the undisputed material facts.  Was plaintiff a

claims adjuster in the traditional sense, a person who made important discretionary decisions as

part of her investigation, or was she merely an assembly line worker mechanically following

orders?   Under the applicable case law and regulations, as described below, if plaintiff was a

claims adjuster in the former sense, then her position was exempt and she cannot recover in this lawsuit.  If the latter description is the correct one, then the exemption does not apply.

Although the parties offer sharply contrasting pictures, they largely rely on the same body of evidence consisting of the deposition testimony of plaintiff and three Crawford supervisors – Curtis Harris, Lawrence Hinkel, and David Martin.  Plaintiff also relies on a large number of exhibits, submitted in three bound volumes, which consist primarily of documents produced by Crawford that plaintiff claims make up the strict rules and regulations that allegedly limited her discretion.  Plaintiff also relies on her affidavit, signed many years after her deposition.

## FACTUAL BACKGROUND

In addition to operating several other lines of business, Crawford is a third-party claims administrator servicing property and casualty claims for other insurance companies and underwriters.  Crawford is not itself an insurance company or underwriter, but instead conducts investigations on behalf of its clients, which include companies such as Great West, Tyson Foods, Liberty Mutual, RLI Transport, and Unitrin.

Plaintiff worked at Crawford's Schaumburg, Illinois office from 1990 through May 2000.  Except for one five-month period in which she worked as a supervisor, a position she found boring, plaintiff was employed as an adjuster.

Plaintiff spent most of time out in the field conducting investigations.  She always did this by herself and was never accompanied by a supervisor.[1]  Her duties typically involved

---

[1]She went into the office about twice a week on average, and she decided when she would go in. (Tr. 147-48.)  She faxed in her daily time sheets that detailed her billable hours.

taking a statement from the claimant, canvassing the scene for witnesses and interviewing them

if necessary, photographing the accident scene, locating various records including police reports

and medical bills, serving as a liaison between the vehicle appraiser and the claimant, and

writing one or more reports to the clients.  She was also involved the settling of some claims,

although the degree of her involvement is the subject of much dispute.  There is a also dispute as

to whether she was required to determine coverage or make assessments about liability.

      **Crawford's Rules And Regulations.**  Plaintiff's argument that she had no discretion

rests heavily on her assertion that Crawford effectively took away any discretion through a

heavily regimented system of rules and regulations.  To support this argument, plaintiff has

submitted many and varied documents consisting of internal guidelines, form letters, slides, book

excerpts, lecture notes,  regulations, and portions of training manuals.  These documents are

numerous and make up a large portion of the 84 exhibits submitted by plaintiff with her response

brief.

      Unfortunately, plaintiff has given little effort to presenting these documents in a clear or

organized way, which in turn has required this Court to spend unnecessary time to sort through

them.  Perhaps the best way to begin is to just list those exhibits that plaintiff contends make up

these "strict rules and regulations":

> Crawford & Company Casualty Service Standards (Ex. 18); Crawford &
> Company – Forms (Ex. 25); Recorded Statement Summary Form (Ex. 27); Denial
> Form Letter (Ex. 29); Photo Mounting Sheet (Ex. 31); a two-page excerpt from a
> book entitled "The Claim Function" (Ex. 32); Principals of Insurance Lecture
> Outline (Ex. 33); Reviewing An Automobile Appraisal (Ex. 36); Reviewing A
> Body Shop Estimate (Ex. 37); Auto Accident Investigation (Ex. 38); Truck
> Accident Investigation (Ex. 39); Interpersonal Skills (Ex. 40); Negotiating Claim
> Settlements Lecture Outline (Ex. 41); Release Of All Claims (Ex. 42); Transmittal
> Reporting Procedure (Ex. 43); Dictation (Ex. 44); Analysis Of A Full Formal
> Report (Ex. 45); How To Deal With Lawyers, Doctors and Other Adjusters –

Lecture Outline (Ex. 46); Crawford & Company Casualty Service Standards (Ex. 47); Liability Training Class Reserves (Ex. 48); Reserves (Ex. 49); Reporting Guide (Ex. 50); Negotiating For Insurance Adjusters (Ex. 51); Truck Liability Accident Investigation Procedural Guidelines (Ex. 52); Auto Accident Investigation (Ex. 54); Photographs (Ex. 55); The Recorded Statement (Ex. 56); Statement Guides (Ex. 57); Drawing Diagrams (Ex. 58); Vehicle Damages (Ex. 59); Reserves (Ex. 60); Negotiating Claim Settlements (Ex. 61); Release of All Claims (Ex. 62); Dictation (Ex. 64); Slides "For the Defense, 1/97" (Ex. 65); Crawford & Company – Forms (Ex. 66); Transmittal Reporting Procedure (Ex. 74); and a Confidential Premises Slip & Fall Outline (Ex. 84).

The first problem with this stack of documents is that plaintiff has not provided any context. In many cases, we cannot tell who the author of the document is, its date, its purpose, or what the larger document is from which the exhibit was taken. Exhibit 33, for example, consists of pages 12 through 17 of a lecture outline. There is no date. We do not know who gave the lecture. Most of these documents have no date at all. Those documents that do have a date have a wide range from 1987 to 1999. There is no indication how these documents were used, and no evidence that they were even kept at Crawford's Schaumburg, Illinois office. It appears that some of them may have been used in training sessions (plaintiff says that she attended a training session in Atlanta in 1990 when she started with the company) but given the varying dates we cannot tell whether plaintiff ever received them.

This leads to a second and larger problem. There is little connection between this stack of documents and plaintiff. At her deposition, plaintiff was repeatedly asked to identify the documents that supposedly constituted the "strict rules and regulations" referred to in Paragraph 7 of her complaint and she typically responded that she could not remember what these documents were or alternatively that the rules and regulations were actually given verbally rather than in written form. *See, e.g.*, Dep. 90, 94, 134. For example, even though three of these exhibits refer to settlement, a key issue in this case, plaintiff never mentioned them in her

deposition and stated that the rules she followed regarding settlement were "verbal." (*Id.* 94.)

Another telling example is the fact that plaintiff in her deposition was given a copy of

Crawford's Casualty Service Standards, a document mentioned prominently in her briefs, and

asked whether she had ever seen it before.  She answered: "It does not look familiar."  (Dep.

146; *see also id.* 43 ("I can't recall seeing it").)[2]  While it does appear that these documents were

produced by Crawford and thus may have been used to train and guide adjusters, plaintiff gives

little effort to establishing this connection.

A third and final problem with these documents is the way plaintiff has chosen to present

them.  In reading through these documents the first time, we had the sense that many of them

were very similar.  Upon closer examination, we discovered that many of these exhibits are

copies (or nearly identical versions) of the same earlier exhibit.  For example, there are two

guides labeled "Dictation"  that are largely the same (Ex. 44 and 64); two documents entitled

Transmittal Reporting Procedures(Ex. 43 and 74); two documents entitled Auto Accident

Investigations (Ex. 38 and 54), and two Crawford Casualty Service Standards (Ex. 18 and 47).

There are also two large exhibits (Ex. 25 and 66) labeled Crawford & Company Forms, both of

which are over 70 pages and are nearly identical.  Not only has plaintiff included this large group

exhibit twice, she has then compounded this first level of duplication with another.  She pulled

out a number of the individual form letters included in these group exhibits, which themselves

---

[2]Plaintiff in her deposition only identified two documents with any specificity.  One was a document she initially called the "Recorded Statement Summary" and then later called the "Recorded Statement Summary Outline."  (Dep. 40-41.)  Though we are not entirely sure, she may have been referring to what is now Exhibit 27, which is entitled "Recorded Statement Summary."  The other document she referred to was a "statement guide" that heped her interview witnesses.  (Dep. 65-66.)  This appears to be a reference, though again we are not entirely sure, to Exhibit 57.

are identical, and then attached them individually as stand-alone exhibits.[3]   The upshot is that

plaintiff has in some cases attached the same document as an exhibit <u>four separate times</u>.  So we

have four different copies, for example, of the Photo Mounting Sheet, which is a one page

document that merely provides the adjuster with two blank spaces to attach photographs.  *See*

Ex. 25, 31, 66, 73.  Likewise, the exact same General Medical Request Form Letter, which like

the Photo Mounting Sheet is an innocuous and unimportant form letter that has no bearing on the

key issues in this case, is also included as four separate exhibits.  Ex. 25, 26, 66, 67.  And they

are all identical.  At a minimum, this sloppy presentation reflects lack of care and

professionalism and has wasted this Court's resources.  At worst, it represents an intentional

effort to create a false impression.  As discussed below, given that many of these documents

directly undermine plaintiff's case, it is perhaps more likely that counsel simply did not spend

the time reading them very carefully.

**Client Service Standards.**  Plaintiff also has alleged that her discretion was limited by

the fact that, in approximately two-thirds of the cases, she was required to follow specific client

guidelines in addition to Crawford's own rules and regulations.  These guidelines, known as

client service parameters, also contained general and specific advice about how the investigation

should be conducted.  Plaintiff has attached several of these clients service parameters.  *See* Ex.

19, 20, 21.

**Futurity Review.**  Plaintiff, as one of her other major arguments, emphasizes the fact

that Crawford had a supervisory review system know as the "futurity review."  Futurity review is

---

[3]These individual exhibits have the identical Bates numbers as the version included in the
larger exhibit.

a process whereby a supervisor checks on the progress of each investigation for each adjuster.

Futurity review is very important, and a branch manager may be fired if he or she were not

"reading futurities" properly.  (P23.)

According to Lawrence Hinkel, who is a branch manager and who testified as Crawford's

30(b)(6) witness, a supervisor conducting a futurity review would

> [make] sure that [the adjusters] have touched upon the issues that are pertinent to
> [the] loss. [I]f they were asked to get a police report, have they achieved, you
> know, that component of the assignment, have they secured the statements that
> have been requested from the parties, et cetera.  I mean, that's basically what you
> look for [] through the futurity process[,] have they achieved what they have been
> asked to do and in a timely fashion.

(Dep. 16.)  Curtis Harris described this process in more general terms: "It's just a review by

supervisory personnel to make sure that files are reported timely and investigation is done

properly."  (Dep. 37.)  When asked what were some of the specific mistakes commonly

uncovered in a futurity review, he stated: "One of the largest was the timeliness issue, not doing

things on time that needed to be done, and omitting important parts of investigative work."

(Dep. 21-22.)  David Martin stated that he would typically pull the physical file and look at the

original instructions given by the client and make sure that they had been followed.  (Dep. 25.)

According to Martin, supervisors would conduct futurity reviews once every two weeks for the

newer people and once a month for more experienced people because "there's a little more

independence in what they do."  (Dep. 26.)  Plaintiff has attached as Exhibit 77 one futurity

review, which consists of one-line entries for each claim with various columns, the last one

allowing for handwritten comments by the supervisor.

All correspondence and reports to clients would be reviewed by a supervisor.  David Martin stated that if there were errors discovered in a futurity review, he "would bring it to the adjuster's attention because obviously the report couldn't go out incorrect."  (Dep. 111.)

## DISCUSSION

Under the Fair Labor Standards Act, if an hourly-wage employee works more than 40 hours in one week, her employer must pay her one and a half times her regular wage for each additional hour worked.  *See* 29 U.S.C. § 207(a)(1); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005).  But there is a "significant exception" to this rule.  *Id.*  It does not apply to employees who are "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1); *Kennedy*, 410 F.3d at 367 (the FLSA's "protections do not extend to everyone.").  Such employees are exempt from the FLSA.

Under the Department of Labor regulations applicable at the time of this case, which have been subsequently changed, there is a long and short test for determining whether an employee was exempt.  *Id.* at 370.  The parties agree that the short test applies here.  It has three requirements.  The first requirement – whether plaintiff was a salaried employee – is not in dispute.  This case therefore turns on whether Crawford can meet its burden of showing that the latter two requirements have been met.  They are:

> (i) whether plaintiff's job duties "consist primarily of office or nonmanual work directly related to management policies or general business operations" of either Crawford or its customers, and

> (ii) whether plaintiff's job included work "requiring the exercise of discretion and independent judgment."

29 C.F.R. § 541.214.  Following the lead of the Seventh Circuit in *Kennedy*, we will refer to the first requirement listed above as the primary duty test and to the second requirement listed above as the discretion and independent judgment test.

## I.      The Primary Duty Test.

There is no dispute that plaintiff's job involved work that primarily involved office or nonmanual work.  The inquiry thus focuses on the phrase – "directly related to management policies or general business operations."  In a separate regulation, 29 C.F.R. §541.205, the DOL further explained this phrase.  Although § 541.205 provides some general guidance, it also sets forth some direct answers.  Relevant to this dispute, it states in subsection (c)(5) that "claims agents and adjusters" meet the primary duty test.  Assuming that plaintiff's job fits the traditional understanding of a claims adjuster, a point that will be addressed in Section II below, then plaintiff's job meets the primary duty test.

The Seventh Circuit has also relied on this language in applying the primary duty test.  In *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066 (7th Cir. 1997), the Seventh Circuit cited to subsection (c)(5) to support its conclusion that the duties of a Consumer Service Coordinator, duties that it stated were "somewhat analogous" to those of a claims adjuster, "easily met" the primary duty test.  *Id.* at 1072.  Likewise, in its November 19, 2002 advisory opinion letter, the DOL also referred to subsection (c)(5) in concluding that certain insurance claims adjusters were exempt.  The DOL stated that it was "significant" that subsection (c)(5) specifically referred to claims agents and adjusters and further stated that claims adjusters would "ordinarily" meet the primary duty test.

In arguing that the primary duty test has not been met, plaintiff relies on what is sometimes referred to as the "production/administration" dichotomy and argues that her work consisted primarily in producing a product (*i.e.* her written reports) according to strict rules and regulations.  The argument is meant to suggest that she was like an assembly line worker who creates widgets according to a detailed set of instructions.  It fails for two reasons.

First, the production/administration dichotomy is neither a clear nor widely relied upon legal test.  It is really an analogy, one that is "suggested" by the language of § 541.205.  *See Shaw v. Prentice Hall Computer Publishing Inc.*, 151 F.3d 640, 644 (7th Cir. 1998).  Although § 541.205 does refer to a distinction between production and administrative work, a distinction roughly correlating to the traditional distinction between white-collar and blue-collar workers, the section does not specifically explain how this distinction should be applied.  And courts have questioned its analytical utility.  *See id.* (asking whether this distinction is "no longer a helpful analogy").  In *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527 (7th Cir. 1999), the Seventh Circuit rejected an argument very similar to the one plaintiff makes here:

> It is true that [plaintiff] supplied customers with reports and filed government forms that in themselves could be considered "products"; however, accepting that argument would mean that any consultant's or analyst's report would be a product.  This result would directly contradict the manner in which the regulations classify these individuals.  The regulations specifically state that advisory specialists and consultants meet the "directly related to" test.  *See* 29 C.F.R. § 205(c)(5).

*Id.* at 540.  Moreover, as the Seventh Circuit recognized in the latter half of this quotation, the production/administration distinction arises out of the same DOL regulation that elsewhere explicitly states that various jobs (including claims agents and adjusters) meet the primary duty

test.  Therefore, the DOL's specific conclusion in subsection (c)(5)  should control over a more

general analogy contained in subsection (a) of the same regulation.[4]

Second, even if the distinction were controlling in principle, it would not be dispositive

here because the underlying factual premise has not been established.  While it is clear that

plaintiff's lawyers were strongly pursuing this theory throughout discovery, they uncovered little

evidence to support it.  It is true that Crawford's adjusters regularly prepare written reports and

that Crawford believes these reports are important and should be well done.  But Crawford

maintains that the primary job of its adjusters is to investigate and resolve claims in an efficient

manner.  The question then is who is right and whether preparing these reports was the adjusters'

primary job in the way that producing a product is the primary job of an assembly line worker.

To support her claim that Crawford viewed its reports as a product, plaintiff relies on the

deposition testimony of the three Crawford supervisors.  *See* P18, 40.  But this testimony fails to

support plaintiff's thesis.  Consider this deposition testimony from David Martin, which plaintiff

relies on:

> [Counsel]:     **It seems to me** that making reports is one of the primary things that an
> adjustor does.  **Would you say that**?
>
> [Martin]:      Primary things, **no**.
>
> [Counsel]:     What would you say a primary thing for an adjustor is to do?
>
> [Martin]:      Investigate claims.

(Dep. 108; emphasis added.)  Or consider this passage from Harris' deposition:

---

[4]Although the Seventh Circuit did refer to this distinction as part of its analysis in its
recent decision in *Kennedy*, it went on to hold that the employees at issue were not production
employees.  410 F.3d at 373.

> [Counsel]:     And the primary product that you can deliver to [clients] is
>                accurate, timely information about what happened with this
>                particular claim?
>
> [Harris]:      Yes.

(Dep. 62-63.)  In sum, this and the other evidence relied upon does not support the factual

premise that the Crawford adjusters were informational assembly line workers solely focused on

preparing a written report.  For all the above reasons, we find that Crawford has met its burden,

under the undisputed material facts, of showing that plaintiff's job satisfied the primary duty test.

## II.      The Discretion And Independet Judgment Test.

As with the primary duty test, the DOL has also issued a specific regulation attempting to

further explain this second test.  29 C.F.R. § 541.207.  While § 541.207 does not provide any

specific answers here like § 541.205 did, it does provide a general rule – namely, that the

exercise of discretion and independent judgment generally "involves the comparison and

evaluation of possible courses of conduct and acting or making a decision after the various

possibilities have been considered."  541.207(a).  The Seventh Circuit in *Kennedy* cited to and

relied on this formulation as a starting point in its analysis.  *See* 410 F.3d at 375.

But for more explicit guidance, we also can look to the case law.  Although the Seventh

Circuit has not specifically addressed the question of whether claims adjusters meet this second

test, it has issued several opinions analyzing this question for somewhat similar jobs and in doing

so has provided some general rules that are pertinent here.  In addition, a number of other courts

have directly addressed the specific issue before us.  Importantly, most of these courts have

concluded that claims adjusters – defined broadly as employees who perform most of the

traditional duties of a claims adjuster such as settling claims within authority limits, making

decisions about how to conduct the investigation, assessing coverage and liability issues, and setting reserves – exercise sufficient discretion to meet this test. *See Murray v. Ohio Casualty Corp.*, 2005 WL 2373857, * 8 (S.D. Ohio Sept. 27, 2005) (granting summary judgment to the employer because, under the old short test, claims specialist exercised discretion when she decided "the extent of questions to ask in obtaining statements," determined which photos were necessary, determined the level of fault in 57% of the cases, settled cases within her authority level of $7,500); *Blue v. The Chubb Group*, 2005 WL 1667794, *12 (N.D. Ill. July 13, 2005) (granting summary judgment: "Investigating, evaluating, and resolving claims requires the exercise of discretion and independent judgment."); *Jastremski v. Safeco Ins. Co.*, 243 F.Supp.2d 743, 756 (N.D. Ohio 2003) (granting summary judgment to employer); *Palacio v. Progressive Ins. Co.*, 244 F.Supp.2d 1040, 1048 (C.D. Cal. 2002) (same).[5]

Before examining whether plaintiff's duties were analogous to those in the above cases, we must first address plaintiff's broader argument that she had no discretion because she was

---

[5]Plaintiff cites to some cases that she believes go against this general trend. But these cases are distinguishable. Several of them involved auto damage appraisers who typically have less discretion that claims adjusters. For example, in *Robinson-Smith v. Gov't Employees Ins. Co.*, 323 F.Supp.2d 12 (D.C.C. 2004), the district court concluded that auto damage appraisers did not exercise sufficient discretion because they did "not interview witnesses and physicians, they [did] not make recommendations regarding coverage of claims, they [did] not determine liability and they [did] not make recommendations regarding litigation." *Id.* at 22 *see also In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litig.*, 336 F.Supp.2d 1077, 1103 (D. Oreg. 2004) (concluding that claims representative did not exercise sufficient discretion because, "in most cases, a vehicle's VIN number tells [them] everything there is to know about the vehicle involved"). Plaintiff also relies heavily on *Bell v. Farmers Ins. Exchange*, 87 Cal. App. 4th 805 (2001). But this California appellate court decision did not address an FLSA claim, although it did look to the FLSA regulations for guidance, but instead addressed a claim under state law. Plaintiff's few remaining cases failed to contain enough detail regarding the specific duties of the employee involved to allow for any meaningful comparison. *See, e.g., Gusdonovich v. Business Info. Co.*, 705 F.Supp. 262, 264 (W.D. Pa. 1987).

constrained by (i) Crawford's strict rules and regulations; (ii) by client service parameters; and (ii) by the futurity review.

These arguments fails for two basic reasons.  First, the Seventh Circuit and other courts have generally given little weight to this type of argument.  The Seventh Circuit has repeatedly stated that both before-the-fact guidelines and after-the-fact supervision are not incompatible with the exercise of discretion.  *See Kennedy*, 410 F.3d at 374 (discretion existed even if "others may review *or even reverse* an employee's judgment" and even if the employee "look[ed] to past work packages for guidance and use[d] a computer to aid in their recommendations") (emphasis added); *Haywood*, 121 F.3d at 1073 ("The fact that Ms. Haywood had supervisors who reviewed her work does not defeat her exempt status under the FLSA."); *see also Dymond v. United States Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982) ("Even though an employee's work is subject to approval, even to the extent that a decision *may be reversed by higher level management*, it does not follow that the work did not require the exercise of discretion and independent judgment as the terms are defined for the administrative employee exemption.") (emphasis added).

*Kennedy* illustrates this principle.  Plaintiffs there worked in a nuclear power plant, which was an "exceedingly regulated workplace."  410 F.3d at 374.  Relying on this fact, the plaintiffs argued that their jobs were "procedure driven, routine, and strictly controlled," leaving them no discretion.  *Id.*  In rejecting this argument, the Seventh Circuit noted that, if "[t]aken to its logical limit, such a blanket rule would prevent any employee at ComEd from falling under the exemption."  *Id.*  It also noted that this general argument could apply to many high-level jobs including those of a tax lawyer or judge.  "Certainly no one would contend that a tax lawyer does not exercise discretion or independent judgment just because the Internal Revenue Code contains

a highly regimented set of rules." *Id.* at 374-75; *see also id.* ("Judges, to name just one profession, routinely look to past decisions to determine how to resolve cases.").

Second, this argument also fails because the undisputed facts again fail to support plaintiff's broader characterization of them. Plaintiff argues that the internal rules, client parameters, and futurity review were collectively so strict that she had few if any decision to make. The undisputed testimony, as well as plaintiff's numerous exhibits, paint a different picture. Although there were guidelines, some of which contained specific rules, adjusters nonetheless still had to make numerous choices throughout their investigation.

Even giving plaintiff the benefit of the doubt and assuming that the voluminous exhibits she has submitted were actually given to and relied upon by plaintiff and the other Crawford adjusters, we find that these documents do not change the result. As these documents themselves make clear, the investigation process involved numerous choices that were often dictated by the unique facts at hand. This was not a process that could be reduced to a set of paint-by-number rules as the following quotations from plaintiff's exhibits make clear:

- It is most important that the [adjuster] learn about motives and [their] relation to human behavior. (Ex. 40 – Interpersonal Skills.)

- There are no fixed formulas [for settling claims]. (Ex. 41 – Negotiating Claim Settlements.)

- A claimsperson <u>must</u> be flexible in order to deal with changing situations and different personalities. (Ex. 33 – Lecture Outline; emphasis in original.)

- In all instances, we must use good judgment to conduct all activities and obtain all evidence in a manner *dictated by the circumstances of each particular assignment*. (Ex. 47 – Crawford & Company Casualty Service Standards; emphasis added.)

It is true that Crawford had some lists with questions to ask during interviews.  But the existence of these lists does not mean that the adjuster could or did mechanically follow them. Plaintiff's deposition testimony confirms this point.  When asked to describe how she used the Recorded Statement Summary, she said:  "Well, it did *not* instruct you *how* to take a statement. It gave you the questions to use on the statement."  (Dep. 45; emphasis added.)  Plaintiff also said that she sometimes had to ask questions not on the list and sometimes asked questions based on her experience and sometimes paraphrased questions.  (Dep. 46-50.)  Plaintiff could not recall any time when a supervisor reviewed beforehand the questions she would be asking.  (Dep. 54-55.)[6]

For example, the Truck Liability Investigation Procedural Guidelines (Ex. 52), which contains recommended questions, states on the first page that the guide should be used to help the adjuster develop "good claims sense" for all investigations.  (Ex. 52 C 6118).  Exhibit 33 states:

> What to ask is not merely as important as how to ask it.  What works for one may fail miserably with another.  There are no absolutes.

Likewise, Exhibits 56, which specifically addresses the task of taking a statement and which contains a number of lists, warns on the first page that the adjuster must determine "which questions" on these lists are appropriate for a particular interviewee and must "[b]e prepared to

---

[6]It is true that plaintiff also testified at one point in her deposition that she eventually memorized the questions on the Recorded Statement Summary because, she said, the process "began to be just rote."  (Dep. 46.)  But later in her deposition, when she was asked if she could remember any of the questions she had memorized, she stated: "I cannot."  (Dep. 69.)  This inability to recall *any* specific question suggests that she did not mechanically recite questions on the list from start to finish.

go outside the recorded statement interview outline if the interviewee's responses lead in that direction."

The client service parameters are similar in tone and scope.  While they contain some specific rules, they do not cover every aspect of the investigation and leave a number of issues to the adjuster's discretion.  Exhibit 20, for example, is  a copy of one these client service parameters.  It has a few explicit rules such as the rule that the adjuster may not to take a statement from the insured driver or co-driver and may not to "comment on" reserves or liability "in the context of any report."  But other instructions are not as specific.  It says, for example, that the adjuster should get a signed statement from the claimant "unless circumstances are such that would indicate a recorded statement would otherwise be more appropriate"; that the adjuster should not take "unnecessary photographs"; and that the adjuster should make recommendations on salvage disposal "[b]ased on [the adjuster's] local knowledge."  These parameters thus have discretion built into them.[7]  And they do not cover every aspect of the investigation.  Plaintiff testified that clients did not give specific instructions about the "writing" of reports but merely gave instructions about "*when* the reports were due.  Some wanted them sooner than others." (Dep. 118; emphasis added.)  Moreover, in one-third of the cases, there were no client service parameters at all.

---

[7]This client service parameter also requests that only adjusters with three years of experience should handle this client's claims, especially those with "serious exposures."  If the parameter provided a rote checklist to follow, then the client would presumably have no need to ask for experienced adjusters.

Plaintiff's argument that Crawford adjusters were strictly controlled by these client service parameters is also undermined by Crawford's Reporting Guide, a document plaintiff has attached and cited to.  It gives adjusters the following pointed advice:

> **DO NOT ASK OUR CLIENT WHAT THEY THINK SHOULD BE DONE!**
> The adjuster is a professional and should use discretion in conducting any and all investigation in a case.  The purpose is to develop a sufficient investigation to provide quality claims handling at a minimum expense to the client.

(Ex. 50; C 6057; emphasis in original.)

With regard to the futurity review, it is true that Crawford had what appears to be a regimented system in which supervisors carefully checked correspondence and reports of the adjusters.  But this begs the key question as to *what* they were reviewing.  Did supervisors review those aspects of the investigation process that involved discretion?  Did they review important matters such as the recommendations to the client?  Was their review so thorough and comprehensive that it served, in effect, as an after-the-fact removal of all discretion?  As the Seventh Circuit stated in *Kennedy*, "[t]he fact that a chosen action might be overruled by a supervisor says nothing about the discretion and judgment that went into its selection *in the first place*."  410 F.3d at 375 (emphasis added).

In fact, it is significant here that plaintiff conducted her investigation and interviews alone with no supervisor present.  This fact alone suggests she had a significant amount of discretion and also that her job was an important one for clients.  How would a supervisor know whether many of the choices that an adjuster made out in the field were wrong when the supervisor only had a written report to review?  Crawford's manuals repeatedly make the point that the *process* of interviewing and negotiating is important because of the effect it has on the claimant.  *See, e.g.,* Ex. 51 ("The first claimant contact has a lot to do with the progress on the

claim leading to settlement.").  This process therefore is not something that can easily be re-done by a supervisor, like an editor removing a sentence from the first draft of a document, because the first impressions have already been formed.  *See id.* at C6092 ("Claimants are very sensitive and can recognize an adjuster's attitude, which can set an adverse tone for all future negotiating with claimants.").

What then did supervisors review?  Hinkel and Harris both testified that the primary function of the futurity review was ministerial in nature – specifically, they said that supervisors reviewed claim files most of all for timeliness and then to make sure whether specific client instructions (such as getting a police report) were followed.  *See* Hinkel Dep. at 16; Harris Dep. at 21-22 (noting that timeliness was one of the largest things a supervisor looked at); Martin Dep. at 25-26.  The supervisor comments on the futurity review sheet plaintiff has attached (Ex. 77) are brief and ministerial, usually only a few words such as "follow up w/atty."  We could find no comments indicating that the adjuster had made a wrong decision on an important matter. This evidence suggests that the futurity review focused mostly on procedural aspects.[8]

When asked in her deposition what types of things her supervisors focused on, plaintiff also referred to the ministerial aspects in writing the reports.  There was a great emphasis on using a standardized format and in particular using a specific set of captions in exactly the same order.  Plaintiff referred to this issue several times.  *See, e.g.*, Dep. 111 (that she had to put the captions in a particular order); 112 (that she had to "follow[] their captions in a certain order");

---

[8]This conclusion is consistent with the fact that plaintiff worked for five months as a supervisor but "quickly became bored" with the job of carefully reviewing and correcting reports and therefore decided to go back being a claims adjuster because it was "less boring."  (Aff. ¶ 11-12.)

112-13 (reports were reviewed to see if "you had [] the captions in [the] order that they had").

She did not identify, with specificity, any substantive aspects of the supervisory review process

even though she had served as a supervisor for five months.  She said that her supervisors

occasionally had some problems with her reporting.  But when asked what these problems were,

she stated first that it concerned her dictation (not "speaking into the dictaphone").  She then

identified the following items:

> I didn't follow the outline guide most of the time.  Captions were out of order.
> Things were not worded correctly sometimes just, you know, my personal
> grammar, so it was things like that; leaving captions off.  The supervisor would
> review them and make the changes or tell me that I needed to add these captions,
> and then I would do so.  Sometime, not having my Recorded Statement
> Summaries written up and attached to them if they were being enclosed.

(Dep. 122.)  This is not the type of review that would be considered substantive and would be

akin to the Seventh Circuit reviewing district court opinions merely to see if they had the caption

and signature block in a standard format, if they used proper grammar, and if they were issued by

a certain date.

Moreover, the futurity review was apparently focused mainly on the written report and,

according to Hinkel, did not cover negotiation:

> Q.     [] What sort of supervision do you provide an adjustor during a
>        negotiation?
>
> A.     Very little.  Generally an adjustor will have assessed the value and the
>        merits of a case, present it to the client.  The client will give the adjustor
>        settlement authority, and then they operate within the confines of the
>        settlement authority extended to them by our client.

(Dep. at 23-24.)

We turn finally to plaintiff's specific job duties, some of which have already been

covered above.  Plaintiff generally argues that she did not settle cases, only negotiated a

minuscule amount of time, did not determine liability or coverage, and did not set reserves.

Crawford argues that plaintiff did these tasks or at least made recommendations to the client

about them.  As set forth below, plaintiff's arguments in her brief are undermined by her own

testimony.

We begin with the most important issue identified in the case law – settlement.

Throughout her briefs, plaintiff gives the impression that she was not allowed to settle claims.

Upon closer examination, her argument is more limited and rests on a series of minor, but

ultimately irrelevant, assertions.  She could not write the check for the settlement.  She normally

could not settle a claim above a pre-set limit.  The in-house adjuster had the final authority for

settling the claim.  Crawford was a third-party adjuster.  Clients did not give her the really big

claims.

Even if true, these assertions do not take away the fact that she was often responsible for

doing the important work leading up to the settlement of the claim – *i.e.* negotiating, assessing,

and settling the claim.  It is these duties that courts have found important in assessing whether an

employee exercised discretion and not whether the employee made the final decision or had

authority to write the check.  *See Kennedy*, 410 F.3d at 374 ("While the Supply Analysts do not

sign the checks, they determine what part is needed and inform others in the administration what

ComEd needs to purchase."); *Piscione*, 171 F.3d at 537 (employee whose job was "to *summarize*

problems in clients' accounts, *inform* the clients about these problems, and *suggest* solutions"

nonetheless "clearly" exercised sufficient discretion to be exempt) (emphasis added); *Haywood*,

121 F.3d at 1073 (discretion was exercised because employee had "some latitude" in negotiating

and settling claims); *Blue*, 2005 WL 1667794 at *13 (claims representative had discretion

because she "ma[de] the first settlement offer, she had absolute authority to settle claims within her given authority, she used specific techniques for negotiating claims, she had responsibility for negotiating settlements with claimants or their attorneys, and she never had a supervisor take over settlement negotiations").  And likewise the fact that an employee negotiated settlements within in a predefined limit has not been considered significant.  *See* DOL Nov. 19, 2002 Advisory Opinion Letter at 3; *see also Edwards v. Audubon Ins. Group*, 2004 WL 3119911, *6 (S.D. Miss. Aug. 31, 2004) ( "Even if an underwriter negotiated within prescribed ranges, he still exercised sufficient discretion and judgment since [] his discretion to negotiate within the prescribed ranges was unfettered."); *Palacio*, 244 F.Supp.2d at 1048 (employee exercised discretion even though she had settlement limits and had to seek approval for larger claims).

Evidence that plaintiff in fact did settle claims, as understood in this practical sense, is once again confirmed by her own testimony.  She repeatedly referred to the fact that she settled claims or made recommendations for settlement.  *See* Tr. 93 ("after you settle claims, you get more comfortable"); Tr. 94 (saying that one of her duties  "was [] to settle claims"); Tr. 97 ("[I] would do an investigation and make a recommendation for a settlement"); Tr. 112 (referring to place on the written report where she put the "settlement suggestions").  She also testified that, when the client set an upper limit on settlement, the client "*always said* try and settle it for less." (Tr. 97; emphasis added.)  And plaintiff says that she negotiated settlements for less than "three times specials" many times.  Even if the client dictated a settlement "figure," the client did not tell her "how you do this."  (Tr. 94.)

Plaintiff also described in her deposition an example of a case where the client set a $5,000 maximum but told her: "if you can, try and lower it first."  (Tr. 99.)  Plaintiff testified that

she then talked to the claimant and offered him $3,000, which the claimant accepted.  (*Id.*)  In

her description of how she settled this case, plaintiff never indicated that she had to go back to

the client and seek approval for the settlement amount under the maximum, nor did she say that

the client ever dictated to her what the particular amount should be.

It is also undisputed that, over the years, plaintiff became more comfortable and skillful

at settling claims for the less than the settlement limits.  If the job of settling claims merely

involved the task of relaying offers and counteroffers between the claimant and the in-house

adjuster, as plaintiff asserts in her affidavit, then it would not make sense to say that she became

more skilled in this process.

Plaintiff's resume, which she used after she left Crawford, is consistent with her

deposition testimony, although not with her affidavit.  Her resume states that one of her job

duties was to "[n]egotiate settlement of claims with first and third party claimants below

settlement authority, resulting in savings to the customer."  (Def. Ex. 4.)  Her resume also

includes a list of accomplishments while at Crawford, one of which was the fact that she

"[s]ettled a claim with over $20,000 in medical bills for $3,000, resulting percent savings to the

customer."  (*Id.*)  This is apparently a reference to the case summarized above.  Plaintiff thus has

been touting to future employers that she had experience in negotiating and settling claims.[9]

---

[9]Fact 46 in Crawford's Statement of Material Facts contains a verbatim listing of the job
duties set forth on plaintiff's resume.  In response to this fact, plaintiff denied that these
descriptions were accurate.  What she is apparently asserting then, without acknowledging it
directly, is that her own resume is untruthful.  Along this line, we note that the person described
in plaintiff's resume, a highly energetic self-starter who negotiated and settled claims as an
important part of her job, and the person described in her affidavit, a low-level employee who
spent very little time negotiating and who never had any significant authority or responsibility in
her job, appear to be two different people.

In addition to plaintiff's deposition testimony, her exhibits also confirm that Crawford believed that adjusters had an important role in settling claims.  Three of the Crawford training documents are specifically focused on negotiating and settling claims.  *See* Ex. 41 (lecture on "Negotiating Claim Settlements"); Ex. 51 ("Negotiation for Insurance Adjusters"); Ex. 61 ("Negotiating Claim Settlements").  Exhibit 51 provides an overview of the negotiating process:

> The negotiating process begins when the adjuster receives the assignment.  In addition to reviewing the initial information about the claim for issues of coverage and liability, the adjuster should consider the long-range goal of settlement.  The negotiation leading to a successful settlement can be looked at as having four components:

> 1.      Determine the goals of the insurer and claimant

> 2.      Know the claimant

> 3.      Control the timing and direction

> 4.      Win agreement

This description – in particular, the reference to the "long-range goal of settlement" -- is contrary to plaintiff's argument that her job merely consisted of producing a written product.  This description also shows that Crawford viewed the negotiation and settlement process as one that started when the assignment is received and extended over the entire investigation and was thus not a task limited to the specific amount of time formally described as "negotiation" on plaintiff's daily time sheets.  Exhibit 33 states:  "*Your decision* on whether to pay a claim and how much to pay is *based largely on your ability to judge* coverage, liability and damage questions based on facts.  Your judgment must come from the interviews of all witnesses & physical evidence involved."  (Emphasis added.)  Why would these manuals and guides exist if

-25-

adjusters' role in negotiating and settling claim was nothing more than that of a courier relaying offers and counter-offers?

Aside from the discretion that plaintiff exercised with regard to settlement, which we believe by itself is enough to meet this second test, she also made liability recommendations. In her deposition, plaintiff was asked what she had to include in her report to the clients. She testified:

> We also had to do liability on what, you know, if the insured is – *what the liability would be* based on the investigation of the witnesses; if *we think*, you know, the insured is at fault, if not.

(Tr. 112; emphasis added.) When further asked how she determined what to put in this liability section of the report, plaintiff gave the following answer:

> By the investigative findings, by speaking with the insured and speaking with the witness and just, you know, taking the facts of the case from the investigation that I collected.

(Tr. 113.)

Moreover, as discussed above, plaintiff had to exercise some discretion in how to interview witnesses – such as whether to veer off the list of recommended questions – and also in how to draft the substantive portions of her report. She also had to make choices as to how many and which photographs to take of an accident scene and how to canvass the scene for witnesses. It is not as clear to what extent she had a substantive role in initially determining coverage or in setting reserves.[10] Even so, we find that all the other duties identified above are enough to meet

---

[10]There is some evidence that she even was involved in these tasks. Exhibit 21 is one of the client service parameters that plaintiff attached to show that she had no discretion. It states: "Advise customer of reserve recommendations and theory of liability by telephone."

the discretion and independent judgment test as they required plaintiff to evaluate and compare

different courses of conduct.  *See* 29 C.F.R. § 541.207(a).

Having found that summary judgment should be granted to Crawford on plaintiff's FLSA

claim in Count I, we also grant judgment to Crawford on Count II, which is a claim under the

Illinois minimum wage law, because plaintiff has not responded to Crawford's argument in its

opening brief that any employee deemed exempt under the FLSA is not eligible for overtime

under this Illinois law.  By not responding, plaintiff has waived any such argument.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted,

and judgment is granted to defendant on all remaining counts.  Plaintiff's cross-motion for

summary judgment is denied.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** March 14, 2006